**Before the Arbitrator**

| | |
|---|---|
| In the matter of the Arbitration between | |
| AMEREN ILLINOIS COMPANY a/k/a AmerenIP | |
| and | Brian Knox Termination |
| LOCAL UNION 51, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS | |

**APPEARANCES**:  R. MICHAEL LOWENBAUM of Lowenbaum Law, appearing on behalf of the Company.

PATRICK SHINNERS of Schuchat, Cook & Werner, appearing on behalf of the Union.

## OPINION AND AWARD

Ameren Illinois Company, hereinafter referred to as the Company, AmerenIP or the Employer, and Local Union 51, International Brotherhood of Electrical Workers, hereinafter referred to as the Union, are parties to a collective bargaining agreement (Agreement) covering employees working in a number of service areas in Central Illinois, including the Galesburg Service Area.  The Agreement provides for arbitration of grievances that cannot be resolved in the procedure provided. The parties were unable to resolve a grievance involving the termination of an employee for alleged violation of the Company's Workplace Violence Policies.  They selected the undersigned from their agreed to panel of arbitrators to resolve the dispute.  A hearing was held in Galesburg, Illinois on March 24, 2017.  A verbatim transcript was prepared and received by the Arbitrator on April 17, 2017.  The parties filed written arguments, which were received and exchanged electronically on June 8, 2017.  Full consideration has been given to the evidence and arguments of the parties in the preparation of this Opinion and Award.

## STIPULATED ISSUE

Was the termination of the Grievant on or about June 27, 2016 for just cause; and, if not, what is the appropriate remedy?

- 1 -

EXHIBIT
**2**

## RELEVANT COMPANY POLICIES

## WORKPLACE VIOLENCE POLICY

### PURPOSE

Ameren strives to provide a safe working environment in which employees, customers, vendors, contractors, and visitors utilizing our facilities and services are not threatened or harmed by any individual's deliberate actions, presence, conduct or communication.  Consistent with Ameren's corporate values of Integrity, Respect, Accountability, Stewardship, Teamwork and Commitment to Excellence, every Ameren employee is expected to demonstrate behaviors consistent with this policy.
*              *              *

### POLICY

Ameren is committed to providing a safe environment for all employees, customers, vendors, contactors, and visitors.  It is a fundamental policy of Ameren and its subsidiaries and affiliates to maintain a workplace that is free from actual or threatened violence of any kind.  This is a zero tolerance policy.  Conduct by or against an employee, customer, vendor, contractor, or visitor that may reasonably be considered threatening, intimidating or aggressive is considered to violate this policy and will not be tolerated.  Such behavior may violate this policy regardless of whether it occurs in person, by use of any communications medium, through Company mail, verbally, in writing or recorded form.  Physical confrontations, violent actions or threats, as well as threatening remarks, gestures or insinuations, are strictly prohibited, particularly those likely to provoke or elicit a violent response.  Unwanted persistent behavior or contact of a violent or threatening nature is strictly prohibited.  Employees who engage in any such conduct will be subject to disciplinary action, up to and including discharge and/or prosecution.  Vendors, contractors, or visitors who engage in such behavior on Company property or Company worksites, or while performing work for the Company, will immediately be removed and may be subject to criminal prosecution.

## PROHIBITED CONDUCT

Ameren will not tolerate any type of workplace violence or intimidation.  Ameren considers the following to represent examples of conduct that violate this policy.  This list is not meant to be all0-sisnclusive:

- Causing or attempting to cause physical injury to another person by such actions as punching, striking, shoving, pushing, or other  physical contact;
- Stalking or *threatening another individual or threatening, talking or joking about engaging in behaviors that harass, intimidate or inflict harm upon another individual*;
- Wearing clothing or other items (e.g., pin, hats) with symbols or slogans or viewing, displaying or bringing into the workplace pictures, publications or videos that incite or depict violence, whether directed toward a living or inanimate object;
- Sending threatening or intimidating messages, or messages that incite violence, including but not limited to messages sent via e-mail, voicemail, Company mail, radios, public address systems, the telephone system, Internet/Internet medium, and/or conveyed through graffiti or symbols;

- Exhibiting aggressive or hostile behavior that creates a reasonable fear of injury (physical or emotional) to another person; or
- Intentionally damaging Company property or the property of an employee, customer, vendor, contractor, or visitor.

z

**ALL UNAUTHORIZED WEAPONS BANNED**

*Ameren prohibits the possession of unauthorized weapons by any employee, customer, on Company parking lots*, on Company worksites, in a Company vehicle, or wherever any employee is performing a function of his/her job, performing duties on behalf of the Company, participating in a Company-sponsored event on or off Company property, or engaging in activity related in any way to employment with the Company. "unauthorized weapons include, but are not limited to, guns, knives, explosives, and other items that may be used to inflict harm other than tools properly used to perform the essential functions of a job. Authorized weapons are those sanctioned for use by the Company, after segment leadership receives approval from Company Security, including those used for security purposes and for other purposes as authorized by business segment leadership (e.g., tools used for food preparation or weapons used for hunting on Ameren property).

## BACKGROUND

The Grievant began working for the Company in 1998. He started as a Meter Reader and began an apprenticeship to become a Lineman in 1999. He became a Journeyman Lineman in 2002. After serving off and on as a temporary Crew Leader for approximately 10 years, he was assigned, based on seniority, to a full time Crew leader position in July of 2015. He was terminated on June 27, 2016 for allegedly engaging in "several acts of serious misconduct," generally described in the letter of termination as follows:

> "…conduct and statements in words or substance…which were threatening, intimidating and aggressive towards a supervisor in your work group, a clear affront to the supervisor's authority, and had an unsecured weapon in your car which was on Company property, all of which violates Company policies and is totally unacceptable in our workplace."

The letter goes on to specify the alleged misconduct, which occurred during three separate incidents. The first two incidents occurred shortly after the start of the shift, on Friday June 3, 2016. The third incident, involving the weapon found in the Grievant's car, occurred when the Grievant reported to the Company for a fact finding meeting on Monday, June 6, 2016. The three incidents are described as follows:

1. "As you were leaving a coaching session with you and your crew, you told your supervisor 'That's fine! Don't ever fucking call us again after 3:15!' and stormed out."

- 3 -

2.  "About twenty minutes later you returned to the supervisors' office with another co-worker and said among other things, that 'I am fucking pissed' and 'I am so mad I could choke you,' while you were visibly shaking with anger.  You ended the confrontation by saying 'If you come in poking buttons like you did, it is going to get ugly and you know what that means' and then stormed out, again."

3.  "On that same day and shortly after these two events, it was reported to management that your threats should be taken seriously because you had been known to have a concealed weapon on your person at work and/or in your vehicle while on Company property.  On Monday, June 6, 2016, we conducted a fact finding meeting with you.  You were informed of the allegations including regarding your allegedly having a gun at work.  You consented to a search of your person and your vehicle at that time.  You told us you did not have a gun on property.  During the search of your personal vehicle which was on Company property, we found a weapon with a loaded magazine attached to a holster unsecured in the pouch behind the front passenger seat. First you told us the gun must have been left there by your son.  Later, you said you had a permit that allowed you to have a gun in your car on Company property."

## BACKGROUND

### First Incident

The Supervisor in question was Gabriel Jones.  He has worked for the Company for nine years, starting as a Lineman in Galesburg.  He was promoted to Supervisor in September of 2013.  After he was promoted to Supervisor, Jones worked in Pioneer Park (Peoria) for two years, supervising drivers of one-person trucks.  He is now assigned to a Supervisor position at Galesburg.

On June 1, 2016, another Supervisor of Linemen at Galesburg, Michael Norman, asked Jones to cover for him in his absence on June 3, 2016.  At that time, Norman informed Jones that there were "some issues" with the ARCOS system that had been implemented in Galesburg four months earlier, on February 10, 2016, to handle overtime assignments in an automated manner. Jones was aware of the problems, which had been the subject of an email he and others received on May 16, 2016.  Norman suggested that Jones do some "coaching" on one of the issues that had occurred that day.  Apparently, the Grievant and other members of his crew had not called in to report they were "working end of day," with the result that Dispatch and the ARCOS system experienced difficulty estimating the number of callouts needed.

#### Jones' Description of First Incident

Jones took the necessary steps to confirm the facts and have the coaching paperwork prepared.  Around 7:00 a.m. on the morning of June 3, 2016, after he delivered his "safety

minute" talk to the Crew Leaders, Jones told the Grievant and his two crew members, Journeyman Matt Sammelman and Apprentice Kyle Kapraun, that they should each come separately to his office for a "coaching." He then went to the front office and asked Bill Rosecrans, Supervisor of Distribution Engineering, to come into his office to serve as a witness.

As Jones was explaining the situation to Rosecrans, he observed Kapraun, in the cubicle across the hall from his office, using the copy machine. Then, the Grievant and Sammelman arrived and they all entered his office.

Jones said words to the effect, "Would you like to do this as a crew, I take it then?" The Grievant responded to the effect, "Let's just get this done." Jones agreed that they could do so. He read the contents of the May 16, 2016 email to the three crew members and then reminded them that he had read it to them on May 17, 2016. He then informed them that if they did not comply with the required procedure it could lead to "coaching as well as potential discipline." Jones offered to give them a copy of the email letter, and they stated that they did not need a copy. He then concluded by saying, "Consider this a formal coaching," informing them that he would be putting a coaching letter in their working file and asking them if they had any questions.

Neither the Grievant nor Sammelman asked any questions. However, as they were walking out the door, the Grievant looked back and said, "That's fine, don't ever fucking call us again." When asked if the Grievant added "after 3:15 p.m.," normal quitting time, and Jones indicated that he did.

Jones looked at Rosecrans and said, "Did you hear that?" Rosecrans said yes and Jones asked him if he put it in his notes. Rosecrans again said yes and he (Jones) put it in his notes.

According to Jones, when the Grievant left his office he was upset and as he left the office area, he heard what he believed to be the Grievant either kicking or pushing open the doors leading out of the office area.

The notes that Jones prepared were generally consistent with his testimony at the hearing. However, in his notes, Jones did not include the words "after 3:15 p.m."

The notes that Rosecrans prepared were consistent with Jones' testimony and notes, but less detailed. They attributed the following statement to the Grievant: "Don't call us anymore after 3:15. Fuck off." Both sets of notes included reference to the fact that, at the outset of the

meeting Jones asked each of the crewmembers if they wanted Union representation and they all declined, a fact that is not disputed.

<u>Rosecrans' Description of First Incident[1]</u>

When Jones asked him to sit in on the coaching sessions and take notes, it was Rosecrans' understanding that the coaching would take place in one-on-one sessions. When he arrived, Kapraun was already in Jones' office, and when the Grievant arrived he wanted it to be done "as a crew." After determining that they did not want Union representation, Jones read the contents of the May 16, 2016 memo to them.

There was not a lot of conversation. They did not deny that they failed to report at 3:15. They declined to ask questions and got up to leave. At that point, as Rosecrans recalls it, the Grievant said, "Don't call us after 3:15 anymore. Fuck off." Rosecrans states that he was "surprised" and "caught off guard" by the comment.

Immediately after the incident, Rosecrans went to his office and wrote notes describing what had taken place. His notes were generally consistent with his testimony. However at the hearing he mentioned that he heard "a bang on the door" as they left the office area, a fact that he did not record in his notes.

<u>Courtni Stillson & Kelsi Peterson's Description of the First Incident</u>

Courtni Stillson and Kelsi Peterson are Operations Support Representatives (OSRs). They are bargaining unit employees who testified under subpoena. They occupy cubicles that are second and third in line after the cubicle where the copy machine is located.

Stillson states that she was aware that the Grievant and two others were in Jones' office with the door shut when "someone kind of abruptly opened the office door and then slammed through the double doors" leading out of the office area. Whoever opened the exit door made an unusually loud noise when they hit the panic bar. She states that it left her "confused about what was going on."

At that point, Peterson came over to her cubicle and they started to talk about "what was going on." They didn't know "what was happening."

---

[1] Rosecrans' office is located furthest away from Jones' office. He was not in his office when the second incident took place.

Peterson states that she heard "some loud angry talk from the back end of the office," where Jones' office is located. She heard the Grievant say, "This is fucking ridiculous," as he walked to the double doors. He then "slammed the doors open."

Peterson then walked over to Stillson's cubicle and talked to her, because she "didn't know what was going on."

### Grievant's Description of the First Incident

In his testimony, the Grievant states that he and his two crewmembers were simply told to come down to Jones' office. They were not told to do so separately, so they did so together. He also states that he did not recall hearing Jones say that it was a coaching session. He believed that they were being "disciplined" for not getting themselves put on the "late list" as working beyond normal working hours, i.e., beyond 3:15 p.m. He states that he did not think that was his responsibility based on the way it had been done in the past. In the past, supervision or the General Foreman would tell one of the Operations Support Representatives (OSRs) who was working past normal quitting time.

The Grievant did not dispute the description of the meeting given by Jones and Rosecrans and acknowledged that, at the end of the meeting, he said words to the effect, "Don't fucking call us after 3:15." He also acknowledged that "It was not the best choice of words." However, he noted, Linemen and some Supervisors, including Jones, regularly use "cuss words" or profanity, including the "F-word," in the field and around the plant.

The Grievant states that he was "frustrated." He felt they were being disciplined for failing to report their status at 3:15. when they were rushed on their last job and found that needed equipment was missing for the next job. "And by the time I realized we're beyond 3:15, it was too late."

The Grievant denied that he "stormed" out of the meeting, as alleged in the letter of termination. He states, "We just got up and walked out," single file.

### Sammelman's Description of First Incident

According to Sammelman, the Grievant, Kapraun and he were told to come into the coaching meeting together, not individually. He states that they were taken into Jones' office together and the door was closed. They were told they were being disciplined for "not calling in to get put on the late list."

- 7 -

Sammelman recalls that as they left, the Grievant said something like "might as well not call us about it then." He did not recall the Grievant using the "F-word." He agreed that it was possible that the Grievant said words to the effect, "That's fine, don't ever call us again after 3:15 p.m.," he didn't remember "that part of it."

Sammelman agreed that it is common for employees to cuss and use profanity, including the "F-word," in the field and at the plant and in front of Supervisors. There was an understanding that you did not do so around customers.

Sammelman says he felt like they were being disciplined unfairly because the ARCOS System was a new system (only one or two months old) and had noticeable flaws. He could tell that the Grievant felt the same. Under the old system, the crew leader could call dispatch and put everyone on the late list, or most of the time, management would do it for the crew. Under ARCOS, "everybody had to call in." but "the Supervisors could still put us on the late list."

**Second Incident**

After this first incident, the Grievant and the other two crewmembers left the office area. The Grievant states that Sammelman approached him in the crew room as he was loading material onto a truck and asked him, "Don't supervision or GF [General Forman] normally put us on the late list?" According to the Grievant, he acknowledged that was something he "didn't think to ask." Then Sammelman asked, "Could we go get clarification on that?" and he said "absolutely."

It was at that point that they returned to Jones' office. The Grievant states that he would not have done so if Sammelman had not brought up his confusion. He was still "frustrated" and only about 5 or 10 minutes had elapsed.

<u>Jones' Description of Second Incident</u>

According to Jones, Rosecrans had left his office and he was finishing his notes when the Grievant and Sammelman returned. The Grievant stood in his doorway, with Sammelman to his left and out of view, and said, in a very loud voice, "I am fucking pissed. This is not right."

Jones' office opens into a hallway, with a line of cubicles on the other side, starting with the cubicle where the copy machine is located and continuing, to the left with cubicles belonging to David Graves., a Gas Verification Specialist, OSR Courtni Stillson and OSR Kelsi Peterson.

Jones states he remained composed and polite, looked at the Grievant, and said, "Brian, you need to calm down." Instead, the Grievant continued to speak in a very loud voice, and said: "I am so mad I could fucking choke you."

Jones states that he then told the Grievant again to "calm down" and "lower his voice." The Grievant then said, "This is bullshit," and he asked the Grievant to come into the office, sit down, and close the door. The Grievant then said, "I don't give a damn who hears this conversation."

At that point, he told the Grievant, "Brian, out of respect for everybody in this office building, we are not going to do this. If you would like to continue this conversation, you need to come in, sit down, and close the door." According to Jones, the Grievant lowered his voice slightly and said, "Vick [General Forman Vick Gray] should've put him on duty." Jones said, "That is not his responsibility, it's the responsibility of the employee." The Grievant then said, "Well what about Mike Norman?" He responded, "Brian, with all due respect, Mike is new, he does not understand the scope of the work or the job that day. He wouldn't know for sure how long it would take." Then he added, "It is the responsibility of the employee to put themselves on duty."

The Grievant continued the conversation by saying, "It had always been that way in the past." and added, "Before I came in and did my coaching, I should've done my research as this is the way it had always been done in the past." Jones replied by saying he was not aware of "any changes as far as management being obligated to put you on call end of duty, and that…ultimately that responsibility lies on the employee." At that point, according to Jones, the Grievant told him:

**"Before I come in poking buttons like I did, I needed to do my research or it was going to get ugly. And I knew what that meant."**

Jones states that he took both this statement and the earlier statement about choking him to be "threats." He states that he took this one more seriously because it was "so open-ended." He did not know exactly what the Grievant was referring to.

At that point, the Grievant lowered his voice and said he was "sick of Vick's shit and [Vick] fucking shit up all the time, and him having to fix his fuck-ups." Jones again reiterated his position that it was the Grievant's responsibility to put himself on duty end of day and the Grievant said, "Duly noted." The Grievant then added, "Going forward I know that no one has

my back going forward and I will take care of this and handle this on my own proceeding" and left the office area.

### David Graves' Description of Second Incident

David Graves, is a Gas Verification Specialist. He is Assigned to Springfield, but often works out of Galesburg. On the day in question he was working in his cubicle located next in line, after the cubicle with the copy machine, on the opposite side of the aisle from Jones' office. At the hearing, Gray testified as to what he heard during the second incident.

Graves recalls hearing a "verbal altercation" happenings in Jones' office, with "a couple gentlemen standing there." One of them was the Grievant. He did not know the Grievant but recognized him as an employee who would "go through the office."

Graves states that he tends to "tune stuff out" while working, so he could not repeat much of what was said. However, he heard a lot of loud talk and use of the "F-word" by the Grievant. The Grievant was "in the office" and the other employee (Sammelman) was "just standing at the door." He "knew that something unpleasant was taking place." The Grievant was "pretty wound up" and "pretty angry sounding." The conversation sounded like it had to do with a callout, or possibly the other Supervisor who was not there that day (Mike Norman).

Graves states that he found the Grievant's conduct offensive. He agreed that the F-word "flies around now and then" in the office, but, "as a Christian," he found it "highly inappropriate" for it to be shouted so loudly in an office environment. Even so, he did not attempt to get involved, thinking it was not his place to do so.

Graves states that after the Grievant left, he entered Jones' office and made a "witty comment." He noticed that Jones appeared to be "shell-shocked" and backed out quietly, deciding to "leave this alone."

Graves was interviewed on the following Monday. The Company's notes taken during that interview were generally consistent with his testimony and he acknowledged their accuracy. They reflect that he "didn't hear the choking comment specifically." They also reflect that he recalled that Jones "seemed calm and quiet," with "no yelling back."

### Stillson and Peterson's Description of Second Incident

According to Stillson, approximately five minutes after the first incident she heard the Grievant "yelling at" Jones. It sounded like he was standing right outside Jones' office. She states that she "recognized his voice."

- 10 -

Stillson did not hear anyone else talking.  She could not understand everything the Grievant was saying, but did hear a lot of "F-words."  However, Stillson states, after a few minutes, she did clearly hear him saying, "I'm so fucking mad I could choke you right now."

The Grievant seemed really mad, so she and Peterson stayed in her cubicle together and "kind of looked at each other" until the Grievant left the office area.

Stillson heard Jones talking to Gray about what had just happened, but he did not talk to her.  Later, during the investigation on Monday, she was interviewed and described what she heard.

During her direct examination, Stillson stated that she didn't deal with the Grievant often, but sometimes experienced a lack of cooperation.  For example, when she called him, he wouldn't answer.  On cross-examination, Stillson was asked how well she knew the Grievant.  She stated that she interacted with him no more than once a week on average, with questions on his timesheet, over a period of approximately three years.  During that time, she never heard him threaten anyone, loose his temper, or raise his voice.   She agreed that she often heard employees "drop F-bombs," say "shit" and other cuss words.

Peterson states that about five minutes after the first incident, she saw the Grievant return and heard him speaking while standing in Jones' doorway or inside his office.  She heard him say, "I'm so fucking mad I could choke you."  She heard him say other things too, cussing, using the "F-word," but she could not recall specifics.  She just remembered that one statement, because it "really stuck out."  She did not hear Sammelman say anything.

Peterson states that she initially remained in Stillson's cubicle because she was "nervous" and "didn't know what was going on." Then when the Grievant came back and started yelling, "we kind of just sat in there until things quieted down."  She did not see the Grievant leave the office area.  When they didn't hear anybody saying anything, she went back to her own cubicle.

On direct examination, Peterson stated that she didn't know the Grievant well, but did have a problem getting him to submit timesheets, and said he "wasn't always cooperative.  On cross-examination, Peterson said that she interacted with the grievant about once a month on average, during the 1.5 years she worked for the Company.  She states that during that time she did not feel "nervous" about him, never heard him make a threat, and never heard him loose his temper.  She occasionally had a problem getting other employees to submit timesheets and had to "nag" them, too.

Like Stillson, Peterson was interviewed on the following Monday.  She states that she said the same things then.

<u>Grievant's Description of Second Incident</u>

The Grievant states that when he and Sammelman went back to Jones' office it was for the purpose of getting clarification.  He admits that he "probably did not use very good terminology" when trying to express his frustration.  He "dropped a lot of F-bombs and probably "got a little high pitched."  He states that he felt like he had "let my guys down" and had "let myself down."

While he recalled expressing his anger, he could not recall if he said "I'm so fucking mad I could choke you," or words to that effect. While it is possible that he did, he wouldn't normally have done so.  If he said it, he did not intend it as a threat to actually do so.  He liked Jones

According to the Grievant, he felt like the Company had changed the policy and came up with a new callout routine.  He states, "we had issues with the new system and felt like "we're being disciplined for our failures and the system's failures.

The Grievant did recall saying "I am fucking pissed."  However, he denies that he ever said anything about "poking buttons," or words to the effect, "it's going to get ugly and you know shat that means."  According to the Grievant, at no time did he make any threats of harm or violence or make any threatening gestures.

The Grievant states that the second meeting ended with Jones telling them "that from here out it was going to be their responsibility, and that we needed to make sure that we managed ourselves properly."  They then "turned around an went to work."

The Grievant acknowledged that he acted in a manner that was unprofessional and that he should have respected Jones' position more.  After this incident, which lasted about 3 minutes, they finished their preparations and left the building around 8:30 to complete their shift.

<u>Sammelman's Description of Second Incident</u>

Sammelman states that he and the Grievant went back to Jones' office to get "clarification."  He didn't remember exactly what was said, but it was "just questions" about how to go about things in the future.  "We wanted to clarify things."  They didn't know what they were supposed to do.  The Grievant did the talking, because he was the Crew Leader and "That's just kind of a normal."

No one else was present. He was in a good position to clearly hear the conversation between the Grievant and Jones. He states, "We…tried to discuss it, but we weren't really getting clear answers about what we were asking. And so I guess both sides were kind of agitated. At some point, the Grievant raised his voice, but he did not "yell." He did use profanity and dropped a couple of "F-bombs."

Sammelman states the Grievant did appear to be visibly upset, but he felt it was justifiable because "we weren't getting clear answers on how to correct the problem, and there were questions we had, and we were trying to understand ARCOS."

According to Sammelman, the Grievant did not say, "If you come in poking buttons like you did, it's going to get ugly, and you know what that means." Nor did he say anything like that. The Grievant didn't make any comments that he interpreted as a threat to physically harm Jones or anyone else. Nor did the Grievant make any threatening gestures to Jones. The Grievant did not "storm" out of the meeting. They walked out and went to work.

**Subsequent Events on Friday, June 3, 2016**

According to Jones, this was the first time he had experienced such a confrontation since he became a Supervisor and he was "dumbfounded." He "didn't know what to think." He had worked with the Grievant in the field for five or six years and he had never seen the Grievant in such a state. As the Grievant stood in the door, he was "physically shaking," "red," and "screaming." He decided that he should talk to others in the cubicles across from his office to let them know "it's under control."

He walked into Gray's cubicle and told him "everything's cool." He then asked Gray, "Did you hear any of that?" Gray said he heard "bits and pieces of it."

Phone conversation with Wedell

At that point, Jones heard his Company cell phone, which he had left in his office, ringing. He went to his office and saw that the call was from Union Business Representative Bob Wedell. He assumed that Wedell had somehow heard about the fact that he had coached three employees and answered the phone. Wedell asked if he was in Peoria and Jones told him that he was in Galesburg. Wedell explained that he was in Peoria and needed access to the Pioneer Park facility.

Then, in an apparent effort to make small talk, Wedell asked Jones, "How's your day going?" Jones told him that he "had a little incident" with the Grievant and "we think we got it

under control." Jones admits that, in the conversation that ensued, he "literally blew it off." He states that he did so because the incident had just happened two minutes earlier, he was still trying to figure out what was going on, and he had not even let his superiors know what had just happened.

Jones states that he "kept it short" and did not tell Wedell any of the specifics or mention the threats. He just said, "It's Brian being Brian," in his mind referring to the initial coaching. He states that "I didn't elaborate or go into the actual physical threat."

Wedell was present a the hearing but did not testify. It is therefore reasonable to assume that he did not dispute Jones' version of their conversation.

Phone Conversation with Brackney

Next, Jones called his superior, Senior Manager of Operations Brian Brackney. According to Jones, he was still trying to digest and figure out what had just happened and his "mind was racing." He told Brackney, "I've just been threatened by an employee and that I didn't know what to do." Jones states that Brackney told him that he would "get corporate involved," meaning that he would notify his superior, Daetta Jones, Director of Division 1. Brackney told him to make notes of his conversation with the Grievant, which he was already doing, and assured him that "it sounded like  he handled it well."

Brakney's Recollection of Events

According to Brackney, Jones called around 9:00 a.m. to tell him that he had a coaching session with the Grievant that "did not go very well." He said that the Grievant was "not very happy" at the end of the coaching and said something to the effect, "Don't call us again after 3:15, fuck off." Jones described the second incident for Brackney. According to Brackney, Jones said the Grievant "came back, was visibly upset, was mad, was shaking, told Gabe he was so mad he could choke him." And, "If he started pushing buttons, things could get ugly, and he knew what that meant."

Brackney asked Jones if he was "okay" and Jones said "I'm shaking." According to Brackney, he "could hear it in his voice." He then asked where the Grievant was and Jones told him he was out on the job. He ended the conversation by telling Jones to "start documenting" the incident and that he would "make some calls."

After this phone call, Brackney called Senior Labor Relations Representative Rick Peers and related what Jones had told him. Peers told Brackney to make sure that Jones documented

- 14 -

everything and said that he would get back to him.  Brackney then called his boss, Daetta Jones and briefed her on what he had heard up to that point.

**Jones Receives a Warning**

Brackney states that he later got a second call from Jones.  In that conversation, Jones told him about a conversation he had just had with Journeyman Lineman Dustin (Dusty) Swanson.  As Brackney understood it, Swanson had "come forward and said that he had heard what had happened, and that he kind of warned Gabe not to take Mr. Knox lightly, he had been known to carry a firearm on his person or in his vehicle on Company property."  When asked if Jones said where he carried it on his person, Brackney added, "I believe there was some reference to an ankle holster."

Brackney states that in his opinion, Jones was "really upset."  He told him to get out of the office for the rest of the afternoon, go into the field to look at jobs, and arrange to not be there when the crews returned at the end of the day.  He then called Peers and Daetta Jones and told them what he had heard.

Jones' Description of Swanson's Warning

While it is accurate to say that Swanson did in fact warn Jones that the Grievant was known to carry a gun on his person and in his truck, his manner of communication at the time was cryptic.

According to Jones, after his first phone conversation with Brackney, he was sitting at his desk, still working on his notes, with his head in his hands, "trying to figure out what was going on," when Swanson came into his office.

Swanson is a Crew Leader, who had previously been a Union Steward and was still active in Union business (as a member of the System Council).  According to Jones, Swanson walked into his office, shut the door and said, "Hey, having a bad day?" Jones chuckled and replied, "Yeah, it's been a little interesting."  Swanson sat down and said "I need to tell you something."

Swanson said, "I heard that ultimately you had a little bit of a run-in with Brian."  Jones replied, "Yeah, it got pretty ugly.  He was screaming, and he threatened me."  Then Swanson said, "I'm not here right now…you may not hear me."  Jones states that it was his conclusion that Swanson wanted to remain anonymous, but was concerned for Jones' safety.

Swanson said, "I want to play a little game of charades," and Jones said "Okay." Swanson said, "You go hunting, right." Jones said, "Yeah, on occasion, I used to, I don't as much anymore." Swanson said, "Well, what do you use when you go hunting?" Jones said, "Well, you've got a gun." At this point, Jones states, he was "starting to pick up on kind of where we're going with this."

After Swanson said, "You got guns?" Jones said, "Yeah, I've got guns. I know Brian has a lot of guns," and, Jones states, Swanson "kind of acknowledged it." At that point, according to Jones, he said, "He's actually probably got one in his vehicle right now on the property." Swanson "acknowledged it in his way that he was doing with this charades game that we were playing."

Jones then said, "Yeah, I actually went to the concealed carry class with Brian." Swanson "nodded" and Jones asked, "He's not carrying on the property, is he?" When Swanson "did not say no," Jones said, "Where on earth would he be able to carry a gun on the property without being seen?" Swanson then "looked down at his ankle." When Jones said "his ankle?" Swanson "pointed to it," and "acknowledged." Jones replied, "Okay, this is a game-changer," and Swanson told him that he "wanted to share that with me…and ultimately he was just wanting to make sure I was aware of it and I should probably take Brian seriously."

Jones states that Swanson indicated that he wanted to "keep it confidential,' and he agreed to do so. However, he admits he did not do so. He immediately called Brackney back, to report what Swanson had told him. He also called Peers.

According to Jones, he felt that he could not keep what Swanson told him confidential, because employees have an obligation, pursuant to Corporate policy and law, to protect the safety of Company employees. The Corporate policy is included in the Workplace Violence Policy and reads in relevant part as follows:

**REPORTING PROCEDURES**

It is everyone's responsibility to prevent violence in the workplace. Anyone who becomes aware of conduct or a situation that may violate this policy must report it to a supervisor, manager, or director, the appropriate HR Services & Employee Relations representative who supports their business segment, and any Human Resources leader, Corporate Security…or local emergency responders…Reports may be made anonymously and all reported incidents will be promptly investigated. Any employee identified as a potential witness is expected to fully cooperate in the investigation and maintain the confidentiality of investigation information. Any employee who fails to fully cooperate in an investigation or to maintain the confidentiality of investigation information will be subject to disciplinary action, up to and including discharge.

Any leader who becomes aware of conduct or a situation that may violate this policy must report this to HR Services & Employee Relations and failure to report the conduct or situation to HR Services & Employee Relations will be subject to disciplinary action, up to and including discharge.

<u>Swanson's Description of Warning</u>

Swanson testified under subpoena. Swanson is a Crew Leader, working for Supervisor Gary Bowen. He was hired the day after the Grievant and likewise worked as a meter reader until he entered the apprenticeship program. He has held a number of Union positions. He served as a Union Steward for about seven years and has been on the local Executive Committee for the last eight years. He has also served twice as one of the four Local 51 members on the System Council Negotiating Committee.

He had worked on the same crew with the Grievant at times in the past and states that they "had our ups and downs." They had disagreements when Swanson would observe the Grievant "not being present…sitting in the cab somewhere" when he and the other crew members were working. He states that, in his capacity as a Union Steward, he received complaints from other Linemen about the same work habits, i.e., sitting in the cab, reading a newspaper and not communicating on the job, "doing his own thing."

Swanson admitted that he personally did not want to see the Grievant reinstated, because of his work habits as described, and his conduct as a Crew Chief (training of apprentices and safety practices), based on the few occasions when he worked as a member of the Grievant's crew and complaints he heard from other Linemen. He did not feel that way about any other Lineman.

On the morning of June 3, 2016, Swanson learned of the incidents, described above, when he entered the building and observed a "lot of commotion and scurrying around" and talking among the other Linemen. He asked what was going on and was told that the Grievant was "up front" in Jones' office having a conversation that led to the Grievant "yelling, and screaming, and cursing at Gabe, and then he threatened him."

Swanson states that he did not ask what the threat was, but he did some reflection that he described as "threat analysis." He "ran over the things that I'd been overhearing for probably the last six to nine months, maybe longer, different conversations that were brought up either on the job, whether it be during the duty day, at night."

- 17 -

In his testimony, and as he did during the investigation, Swanson refused to identify the employees he was referring to. However, according to Swanson he heard that the Grievant was carrying a gun on the property at work  A few of them indicated that "it was on his ankle."

In addition, Swanson testified about a phone call he received from one of the Linemen, about certain disturbing statements the Grievant had allegedly made in his presence.  Swanson states that the employee said: "Brian came in and was telling a story about how he was at Wal-Mart one night, or the night prior, and he was walking from Wal-Mart to his car, a gentleman got within close proximity to him, and Brian pulled a gun on him."  In response to his questions, the employee told Swanson that "there was nothing there that would make a person fear for their life."  And he said the Grievant was "pretty excited to tell the story."

After thinking about it, Swanson concluded that "I don't think I could live with myself in the event an incident did happen," and he did not share what he had heard.  After talking it over with a crew member, he decided that he, as a Crew Leader, should tell Jones what he knew.

According to Swanson, when he entered Jones' office, Jones appeared to be "distraught." He was holding his head in his hands and looking at a note pad on which he had been taking notes.  He closed the door quietly, sat down and said, "Hey, having a bad day?"  He asked Jones what happened and he said the Grievant "came in here and screamed at me and cussed me out in front of everybody" and that "the entire front office heard it."  He added, "and then he threatened me."  Swanson did not ask what the threat was.

Swanson described the manner in which he communicated the information in a way that was consistent with Jones' testimony.  When he got to the point where Jones realized he was talking about guns, Jones said, "Oh yeah, I know, Brian's got tons of guns, and he's probably got one in his truck right now."  Swanson smiled and said, "Now you're following down the path I'm heading you in."  He then stood up to leave and pointed to his ankle.

Swanson states that he intended his warning to Jones to apply "outside of work."  "This is warning him for his personal safety as well as his family, if you ever met him in a dark alley and Brian decided to tie his shoe and he was mad at him, you know, look out."

Swanson states that he was and remains "mad" and "furious" with Jones for disclosing what he told him in confidence.  Later, when he learned that the Company had searched the Grievant's person and his vehicle, he attempted to discuss the matter with Jones.  When Jones finally accepted his call, Jones at first claimed that the Company's action was based on an

- 18 -

"anonymous tip." When pressed, he admitted that the decision to conduct the search was based on what Swanson had told him.

**Events on Monday, June 6, 2016**

After he leaned of the conversation Jones has with Swanson, Brackney had a number of conversations with Peers and others that day (Friday, June 3, 2016) and over the weekend, deciding on how best to proceed. It was agreed that there would be a conference call on Monday morning, involving representatives from Operations, Security, Legal, Labor Relations and HR. It was decided that Peers and Corporate Security Investigator Tony Norman would come to Galesburg and help conduct a Fact Finding investigation.

### Peers' Description of Finding Gun

Around 2:30 that afternoon, Peers and Norman met with the Grievant. Union Steward Brad Wheeler was present. Peers and Norman told the Grievant that they were there to interview him about the "incident" on June 3, 2017 and "some talk of guns." Norman asked the Grievant if he would agree to a search of his person to see if he was carrying a gun. The Grievant agreed and Norman did not find a gun.

At that point, Norman asked the Grievant if he would agree to a search of his vehicle and the Grievant agreed. The four men went out to the Grievant's truck, which was parked on Company property. A representative of the Knox County Sheriff's Department was also present, pursuant to Norman's request.

Norman conducted the search of the Grievant's truck. He found a hand gun in the truck and gave it to a Sheriff's Deputy. The Grievant maintained that he did not know that the gun was in his truck and stated that it might belong to his son; that they had been out target shooting over the weekend. Later, he said "Well, I have a license, it could've been mine."

### Norman's Description of Finding Gun

Norman is a former police officer, with 27 years of experience. He has worked as a Corporate Security Investigator for the Company Since April of 2015.

Prior to the interview, Norman was told that there was an Ameren employee that made a threat to his supervisor, and after the threat, they had gotten information that the employee "was known to carry a firearm at work or on Ameren property." He had no knowledge of any specifics or if it was true.

Norman states that prior to the interview he asked the Grievant if he had a firearm in his possession and he said, "Absolutely not." He then asked the Grievant if he had a firearm in his truck and the Grievant said "No." After securing permission and searching his person and finding no firearm, he asked the Grievant if he could look in his truck to determine if there was a firearm there. The Grievant agreed.

The four men went out to the Company parking lot in front of the plant and the Grievant unlocked his truck, a full sized pickup truck (Ford F-150) with four doors. During his search of the back seat area, Norman saw a "bulge" in the pocket on the back of the front passenger seat. In the pocket, he found a handgun in a clip holster. He did not take the gun out of the holster, but he examined the magazine and determined that it had rounds of ammunition in it.[2]

Norman asked the Grievant if he knew the gun was there. The Grievant said he did not know it was there. Norman then gave the gun to the Sheriff's Deputy and asked him to secure it until they concluded their interview. He then completed his search of the truck and did not find any additional firearms.

The four men then went back into the Company conference room. Norman told the Grievant, "Ameren policy does not allow Ameren employees to have unauthorized weapons or firearms on any Ameren properties." The Grievant stated that he did not know that the gun was there, but he was under the impression that it would be legal as long as it was locked in his truck. He added that he had been told during his concealed carry class that it was legal to leave a gun in his vehicle if the vehicle was locked and the gun was out of sight.

During the interview that followed, the Grievant continued to maintain that he did not know that the gun was in his truck and believed that it may have been left there "from over the weekend" because he and his son had been target shooting. Norman asked the Grievant if he had ever been in possession of a firearm in an Ameren building and he said no. He also asked the Grievant if he had ever taken a firearm out in the field when he was working. "The Grievant said he had not, that there was not really a need to."

<u>Grievant's Explanation for Presence of Gun</u>

In his testimony at the hearing, the Grievant gave a detailed explanation for the presence of the gun in his vehicle. He states that he had no idea that it was there. He and his family (wife,

son and daughter) had used the truck to go target shooting in an area located on his parents' farm. They took approximately 20 guns with them.

When they returned home after shooting targets, the Grievant remove the long guns and started cleaning them. His son removed the range bags, targets and pistols. He told his son to make sure that all the guns were removed from the truck.

The Grievant acknowledges that he said that his son must have left the gun in his truck and that he had a permit that allowed him to have a gun in his vehicle on Company property. He maintains that both those statements were true and not contradictory.

The Grievant bases his belief that he had a right to have a gun in his vehicle on what he was told by the instructor at the concealed carry class he attended. As the Grievant recalls it, the instructor said, "That in order for an entity to disallow a weapon on the property, the property had to be posted as such." According to the Grievant, the Company did not have such a posting.

The Investigation Continues

After they returned from the parking lot, Peers took over the interview and asked questions about the two incidents on June 3, 2016. Norman did not pay much attention to that exchange and used the time to write up his notes. When Peers was finished with the interview, he told the Grievant that he was suspended pending investigation and Norman escorted him out to the parking lot.

Norman spoke to the Sheriff's Deputy and learned that the Grievant had a valid firearm owner's card and concealed carry permit and was able to legally have the gun. Norman gave the gun to the Grievant and he left Company property.

Grievant's Interview by Peers

Peers states that during the interview the Grievant generally denied that he said or did anything wrong during the two meetings he had with Jones. With regard to the first meeting, he denied yelling and screaming and stated that he "wasn't that upset." He said "ARCOS was the problem behind all this and [the] dumbshits couldn't get it right." When he was asked if he said "don't call me after 3:15" and "fuck off," he said "No, I knew I'd messed up, and I was saying I probably just fucked myself."

---

2 According to the Grievant, the gun, a 45 Solo Carry Kimber, was not "loaded." There was no bullet in the chamber and the magazine was "with the gun." The letter of termination states that the magazine was "attached to a holster."

- 21 -

With regard to the second meeting, he acknowledged that he was upset. He was not asked, but did not deny using the "F-word." However he denied ever threatening to choke Jones or making the statement about how "you're pushing buttons" and "you better watch out."

<u>Grievant's Version of His Interview</u>

The Grievant was asked about this interview during his testimony on cross-examination. He acknowledged that he probably said "No" when Peers asked him if he said "Don't fucking call us after 3:15." When asked about the contradiction between that denial and his testimony on direct, he offered the following explanation: "My clarity of mind, I probably misspoke."

Norman spoke to the Sheriff's Deputy and learned that the Grievant had a valid firearm owner's card and concealed carry permit and was able to legally have the gun. Norman gave the gun to the Grievant and he left Company property.

**<u>Fact-Finding Investigation of Gun Rumors</u>**

On the following day, Norman participated in the interview of eleven employees in an effort to determine if they were aware of any instances when the Grievant had a firearm on his person or in his vehicle while at work. Also present were Peers and Anita Lengacher from HR and Union Business Representative Bobby Wedell.

The employees were advised of the purpose of the interviews and asked a series of four questions as follows:

It's allegedly common knowledge that Brian Knox carries a firearm at work.

(1) Have you ever seen Brian Knox in possession of a firearm on Ameren property?

(2) Have you ever seen Brian Knox in possession of a firearm while working on an Ameren jobsite? If so, when and where?

(3) Have you ever seen a firearm in Brian Knox's personal of Ameren vehicle? If so, when and where?

(4) Has Brian Knox ever talked about carrying a firearm on his person or in his vehicle?

The answers recorded indicate that none of the employees claimed to have seen the Grievant in possession of a firearm on Ameren property, in possession of a firearm while working on an Ameren jobsite, or in his personal or Ameren vehicle (except while off duty and during the search of his personal vehicle the day before). With regard to the fourth question, a

number of employees stated that they had heard him talk about guns, concealed carry, and hunting, suggesting that he did at times carry a firearm on his person or in his vehicle while off duty.

The answers recorded also indicate that the discussion expanded at times to include questions about the Grievant's temperament and whether the employees had heard any rumors and whether the Grievant had ever talked about carrying a gun at work or implied that he had a gun at work.  A couple of employees admitted that they had heard rumors to the effect that he had brought a gun to work.  In particular the recorded answers for Swanson read as follows:

> "Generally he's a concealed carry—he talks about guns in general—nothing specific about bringing them to work—isn't around BK that much.

> "Speculation—rumors—but never anything that's given real concern."

According to Peers, as the interviews progressed, some of the employees made comments to supervision, that "they were not asking the right questions," and "people wanted to talk but were afraid to come right out."

## Decision and Final Meeting with Grievant

Peers provided Daetta Jones with the results of his investigation and she made the decision to discharge the Grievant.  Her findings are set out above.  Her reasons were stated as follows:

> "Ameren is committed to providing a safe working environment in which employees, customers, vendors, contractors, and visitors at our facilities are not threatened or harmed by any individual's deliberate actions, presence, conduct, or communication.  In support of this commitment, Ameren has in place a Workplace Violence Policy (WPV Policy) and every employee is expected to demonstrate behaviors consistent with this policy.  The WPV Policy specifically states, 'Conduct by or against and employee…that may reasonably be considered threatening, intimidating or aggressive is considered to violate this policy and will not be tolerated…threats, as well as threatening remarks, gestures or insinuations are strictly prohibited…Employees who engage in any such conduct will be subject to disciplinary action, up to and including discharge…' Further, the WPV Policy 'prohibits the possession of unauthorized weapons by any employee…while on Company property including in vehicles located on Company parking lots, on Company worksites…' Our records indicate that you have received notice and/or training on Ameren's WPV Policy on a regular basis during your time at Ameren and most recently a CBT training on October 22, 2015 and policy review on February 16, 2016.

> "Providing a safe work environment and maintaining a workplace that is free
> from actual or threatened violence is fundamental to Ameren Illinois. Based on
> your series of egregious misconduct and finding no mitigating circumstances,
> your employment is terminated effective June 27, 2016."

On June 27, 2016, the Grievant arrived at the facility for a meeting with Peers, held for the purpose of informing him of the decision. Wedell was present to represent the Grievant, Jim Morrissey was there from Security. Morrissey asked the Grievant if he minded if he patted him down for a weapon. When the Grievant said "no," Morrissey mistook his answer for permission and started to pat him down. The Grievant jumped back and said, "I said no." The Grievant, who was wearing shorts, then lifted his shirt and it appeared that he did not have a firearm on his person. The matter was dropped.

They then entered the facility and Peers read the letter of termination aloud. Wedell then met with the Grievant separately. When they returned, the Grievant boxed up his personal tools and supplies and Morrissey escorted him off the property.

## Additional Testimony by the Grievant

In his testimony at the hearing, the Grievant noted that he only had one item of discipline in his record, after 18 years of employment, a Written Reprimand in 2006, for an accident he had with a Company Truck. He had never been counseled or disciplined for making a threat or having a gun in the workplace He disputed the testimony that he ever worked in an unsafe manner and noted that even though he was selected on the basis of seniority, he could have been removed from his position as a Crew Leader if the Employer thought he was unsafe.

The Grievant also disputed Jones' testimony about their relationship prior to June 3, 2016. He states that during the time he and Jones worked together on the same crew, they and their wives had gotten together a couple of times and he considered Jones to be a social friend. He states that he was surprised by Jones' testimony about the issues he had with the Grievant's work habits and safety practices.

The Grievant testified about the process and training required to get a concealed carry permit. A person can be disqualified from obtaining a permit for mental illness, felony convictions or a history of violence. He stated that he had never been charged with any type of gun offense. He named a number of other Linemen who had obtained concealed carry permits—

Derek VanUnnik, Lamont Littlefield and Jeff Nichols. At the hearing he learned for the first time that Jones, who started the course with him and at his urging, did not complete the course.

The Grievant admits to being a "gun enthusiast." He owns more than a hundred guns. According to the Grievant, there is what might be described as a "gun culture" at the Galesburg plant. Nearly everybody hunts and or sport shoots. Employees talk openly about guns during working hours. He identified as other "gun enthusiasts"—Jay Leathers, Derek VanUnnik, Jeff Nichols, Lamont Littlefield, Aaron Layton and "a whole lot of gas people." He stated that he had gone target shooting with other employees, naming Sammelman as one.

The Grievant states that he was stunned to learn that he was being terminated. He admits that, in hindsight, he "would've definitely used better tact. I should've never approached the conversation that way." He states he had never done anything "like that" in his 18 years with the Company and would not do it again.

The Grievant denies that he "pulled a gun" on anyone at Wal-Mart or that he ever said that he did. He states one time he was "chitchatting" with Mark Brown and he mentioned "a dream that I had." According to the Grievant, he has never pulled a gun on anyone in his life.

The Grievant also denied that he engaged in unsafe work practices. He states that he and his crew follow the safety rules as closely as possible, every day, to maintain their own safety and the safety of equipment. He notes that except for the one accident he had, he had never been disciplined for a matter of safety or anything else.

Finally, the Grievant denied that he had ever carried a weapon "on his ankle at  work" or "anywhere on his person" or "while he was on work time."

**Additional Testimony by Sammelman**

According to Sammelman, he did not recall having any conversations with the Grievant about what transpired in Jones' office during the rest of their shift. If they did, nothing stood out in his mind.

Sammelman did not recall whether the Grievant asked  him to go target shooting at his parents' farm that weekend. He didn't go target shooting with him that weekend, but had done so once or twice.

Like the Grievant, Sammelman described the "gun culture" that exists at the plant. Based on conversations, several people, including the Grievant, have concealed carry permits. "A lot of us go shooting and a lot of us hunt."

It is Sammelman's opinion that, for some personal reason, Swanson, who got along with everyone else, did not get along with the Grievant. He was not sure why, but he noted that Swanson had been an Army Ranger and the Grievant had been in the Navy and Swanson thought that he was "better" somehow.

Sammelson was interviewed on Monday, as part of the investigation. He states that he was "shocked" when he later learned that the Grievant had been terminated. He disagreed with the testimony about the Grievant's alleged safety problems. He stated that he liked working for the Grievant as Crew Chief and felt that he was a very capable and knowledgeable Journeyman and never put his crew at a safety risk. He was not interviewed on that subject.

On Cross-examination, Sammelman acknowledged that when he stared with the Company as a Journeyman, in November of 2014, he faced some resentment because he came form a non-union environment and some employees felt that he was not worthy of being a Journeyman and worked too slow. The Grievant "took him under is wing" and was the only Journeyman Lineman out of twelve, who looked out for him.

## COMPANY'S POSITION

This case is about fear of workplace violence, a matter that has become epidemic. The Grievant was not discharged because he has an affinity for guns as a hobby. He was discharged for violating the Company's Workplace Violence Policy (WVP) by admittedly threatening a supervisor with bodily harm and for bringing a loaded weapon onto Company property. His threats were exacerbated by his apparent ability to carry them out, given the proximity of a loaded weapon. The supervisor was badly shaken by the experience and remains fearful of the Grievant to this day.

In this context, the fact that the Grievant had 18 years of service and a mostly clean disciplinary record is irrelevant. Those considerations are effectively erased by the Grievant's conduct. Further, in the unlikely event that the Arbitrator finds that the Company did not have just cause to terminate the Grievant at the time of the decision, the after-acquired evidence concerning his poor and unsafe job performance provides a sound basis for denying him reinstatement as part of any remedy.

Granting the grievance and reinstating the Grievant would send the wrong message to the workforce and the community as a whole. The grievance should be denied in its entirety.

### Company Had Just Cause

While the burden of proving that there was just cause to terminate the Grievant is on the Company, the Company meets that burden if it can show, by a preponderance of the evidence, that its action was justified. The Company's decision was based on undisputed facts. While the Union raised a number of red herrings, two critical facts emerge from the record: The Grievant

- 26 -

did verbally threaten a supervisor with bodily harm and other, unspecified retaliation; and, the Grievant did have a loaded gun in his truck in the Company parking lot. The Grievant did not deny these facts.

The evidence is also undisputed to the effect that the conduct was prohibited by the WVP and that the Grievant was aware of the policy, received annual training on its contents, and was familiar with its contents. Specifically, that policy prohibits "threatening another individual or threatening, talking or joking about engaging in behaviors that harass, intimidate or inflict harm upon another individual," and it "prohibits the possession of unauthorized weapons by an employee, customer, vendor, contractor, or visitor while on Company property including in vehicles located on Company parking lots."

The Grievant threatened Jones with bodily harm on two occasions on June 3, 2016. He admits that he told Jones that he was so mad at Jones that he could choke him, and he told Jones that if he kept "poking buttons" things would "get ugly" and that Jones knew what that meant. In addition, during an authorized search conducted on June 6, 2016, a loaded gun was found in his vehicle on the Company parking lot.

The Company conducted a thorough investigation before it decided to discharge the Grievant. It interviewed 11 employees, including all the employees who were present in the office during the incident and members and former members of his crews. It also interviewed the Grievant in the presence of his Union Steward and suspended him pending further investigation and deliberation.

Arbitrators have routinely held that discipline, even discharge, is appropriate for workplace violence, including threats of the type that occurred in this case. (Citation and discussion of cases and authorities omitted.) The only remaining question in the just cause analysis is whether "the punishment fit the crime."

The policy states that it is a "zero tolerance policy" and states, in two places, that a violation of the policy may result in discharge. Here there were two threats to a supervisor and the concealment of a gun in the Grievant's truck on the parking lot.

The threats were not taken lightly. Jones left the office that day shaken and fearful. His wife, also a Company employee, was reduced to tears that evening. Members of the office staff huddled in fear in a cubicle during the Grievant's tirade. The Company provided security for a month after the incident. At the hearing, Jones was still fearful of the Grievant. The Company cannot risk the safety of employees by continuing to employ the Grievant, a gun enthusiast who has boasted about his collection of over one hundred weapons.

Fortunately, the Company does not have a history of prior cases involving similar violations of the WVP to draw upon. In one case, involving a Gas Journeyman by the name of Jesse Driver, the arbitrator found that the Company had just cause to discharge him for merely making threats *in the presence of a supervisor.*

Given the gravity of the Grievant's misconduct, the Company could not, and did not, mitigate the penalty. Its judgment in that regard ought not be disturbed or second-guessed by the Arbitrator. There is substantial arbitral authority to support the view that, when the employer has met its burden of proof in a discharge case, the arbitrator ought not substitute his judgment for that of the employer. (Case citations omitted.)

## Union Defenses Lack Merit

### Attempts to Minimize the Incident

The Union seeks to minimize the seriousness of the Grievant's threats. On the contrary, they were serious and warranted discharge. Jones, Stillson and Peterson all testified that they heard him tell Jones "I'm so fucking mad I could choke you." And, the Grievant himself does not deny that he said it.

While the Grievant did deny that he told Jones that if he came in "poking buttons" it was "going to get ugly" and that Jones knew "what that meant," his denial is not credible. Jones testified in a straightforward manner, recalling the incident in detail. Significantly, he included it in his notes prepared almost immediately after the incident.

During his interview, the Grievant claimed that he was not that upset and denied that he threatened Jones, or yelled at him. At the hearing, the Grievant admitted that he was angry and could not recall everything he said. While he claimed that he was not mad at Jones, but mad at himself for letting his crew down, he admits that he told Jones that he was "fucking pissed." Also, he denied lambasting Victor Gray even though he could not explain why Jones would have said that he did and put it in his notes.

While Sammelman denied that the treats were made, his credibility was compromised by a litany of memory lapses and outright fabrications. On cross examination, he denied numerous facts that are either admitted or indisputable. He denied that the Grievant said he was "fucking pissed," that the Grievant said he was so mad he could choke Jones, that the Grievant told Jones that he should have done his research before administering the coaching, and even that the Grievant was talking loudly. Further, Sammelman could not remember if Jones told them it was a counseling session, did not see Rosecrans taking notes, and did not know if Jones read the email to them.

Sammelman had a motive to tailor his testimony to favor the Grievant. He admitted that he was ostracized by the other employees because he came from an non-union background and was perceived to be a slow worker. The Grievant served as his mentor and became his friend. He only worked with the Grievant after he became a crew leader, and had never witnessed the Grievant's slovenly work habits.

Other efforts by the Grievant and Union to downplay the significance of the threats were ineffective. The Grievant testified that he had "no clue" that he was in trouble when he left work that day and the Union argues that the Company would not have let him finish his shift if it believed he had made serious threats. The facts defeat these contentions.

- 28 -

Jones was shaken and uncertain as to how to proceed. He immediately called Brackney for guidance and began to make notes. Both Brackney and Graves testified that Jones was shaken and fearful of the Grievant. Brackney called Daetta Jones it was agreed that the Grievant would not be recalled from the field and that Jones should leave the office so he would not be present when the Grievant returned. Jones was offered police protection and offered the opportunity to stay at a motel that evening.

The Union elicited testimony from several witnesses to the effect that they were not afraid of the Grievant. That does not excuse his conduct or mitigate the threats he made. Swanson said he was not afraid of the Grievant but admitted that he was concerned for Jones' safety because the Grievant had a concealed carry permit. VanUnnik admitted that he was not confident about the Grievant's ability to control himself. Leathers testified that he overheard the Grievant tell a story about pulling a gun on another individual in a Wal-Mart parking lot. The Grievant denied that he had ever pulled a gun on anyone, but gave vague testimony about how he told another employee about a dream he had, which Leathers overheard.

The precautionary steps taken by the Company over the weekend and in the days that followed do not suggest that it took the incident lightly or viewed the threats with skepticism. They establish that the Company took them extremely seriously. The fact that Jones downplayed the incident when he spoke to Union Representative Wedell is not significant. He had not yet had a chance to discuss the situation with Brackney. It is understandable that he would not want to discuss the situation with Wedell before he had done so.

<u>Illinois Law Does Not Exonerate the Grievant</u>

The Grievant had a gun in his car while it was parked on Company property. His claim that he did not know the gun was in his truck is not credible. When the gun was discovered during the investigation, he initially said that his son must have left it there. Later he claimed that he had a legal right to have the gun in his truck. He acknowledged that he regularly transported guns in his truck but claimed that this is the first and only time he had a gun in his truck while it was on Company property. Later, he testified that he could have had a gun in his truck on Company property at other times and not been aware of it. Leathers testified that it was his understanding that the Grievant kept a gun in his truck after he got his concealed carry permit.

Norman testified that the gun was "loaded." According to the Grievant, the gun was not loaded. Instead, the magazine clip, which was loaded, was attached to the holster. The difference is hardly significant. In any event the WVP prohibits the possession or concealment of a weapon on Company property.

According to the Union, under Illinois law the Grievant had the right to store the gun in his truck while on the Company's parking lot. The Union may be right about the law, but it is wrong about the impact of the law on the Company's right to discharge him.

The provisions of 430 ILCS 66/65 (b) do allow the holders of an Illinois concealed carry permit to bring a gun onto the parking lot of a company that otherwise prohibits them from bringing guns onto its property. However, that provision deals with the rights of permit holders under the

- 29 -

concealed carry law, not the employment policies of the company. The provision means that permit holders are not in violation of the concealed carry law (or acting outside the purview of their permit) by bringing a gun onto the premises of a company that prohibits concealed carry, provided the gun is left in a locked vehicle and secured in a "case" out of view. The fact that such an individual does not violate the law does not mean that he or she has complied with an employer's rule prohibiting the presence of a weapon on company property.

The cited provision has not yet been interpreted by the courts and the legislative history is sparse. However, it is significant that the concealed carry law appears in that part of the Illinois statues dealing with public health and safety (Chapter 430), not a chapter relating to employment. No section of the Illinois statutes precludes an employer from enforcing a workplace violence policy that prohibits employees from bringing weapons to the workplace.

If the Grievant believed that he had a right under to law to disregard the Company's prohibition and bring a gun onto the Company parking lot, he had other ways to test the legality of the policy without violating it and risking termination. He could have contacted HR to determine the Company's view of his rights, filed a grievance, or tested the prohibition in court.

The Arbitrator is not a judge or jury in Illinois. His role is to interpret and apply the terms of the collective bargaining agreement, not decide the parameters of state law. He should limit his consideration to the application of the policy to the Grievant's conduct and not the impact of external law on the vitality of that policy. The fact that the Grievant's actions may have been within the parameters of his concealed carry permit is irrelevant.

The terms of the policy are clear and were known to the Grievant. The policy prohibits an employee from possessing a weapon on Company premises, expressly including in a vehicle on the parking lot. Arbitrators have a long history of upholding discharges based on possession of a firearm on company premises. (Citations omitted.)

<u>Mitigation of the Discharge is not Warranted</u>

The Union will argue that discharge was too harsh a penalty for an employee with significant tenure and a disciplinary record that is virtually clean. That argument might have been persuasive if the Grievant's conduct had not been so egregious.

**Reinstatement or Back Pay Would be Inappropriate**

Even in the unlikely event the Arbitrator were to conclude that the Company lacked just cause to terminate the Grievant for the reasons given at the time of his discharge, the remedy should not include reinstatement or back pay.

Evidence acquired after the discharge establishes that the Grievant should not be reinstated due to his appalling work performance and disturbing record of work-related misconduct, including significant safety violations in the years preceding his discharge

It is regrettable that—due to the employee "code of silence"—the Company did not become aware of the Grievant's performance lapses until it interviewed fellow employees in preparation for the hearing.

At the hearing, the Company presented evidence, in the form of testimony under subpoena from a number of reluctant coworkers, sufficient to establish that the Grievant ought not be reinstated.

While arbitrators have taken a variety of positions concerning the use of after-acquired evidence, a majority take the view that it can be used to support the merits and/or the remedy. (Citations omitted).

The Grievant should be denied back pay for another reason. In his testimony, he contended that he is a "very good Lineman" and conceded that Linemen are in demand at this time. Even so, he now works at a mental health facility where he does not use his Lineman skills. Thus, he has done little to mitigate the Company's potential liability for back pay.

The reason for the Grievant's reticence to practice his profession is his apparent interest in filing suit against the Company over concealed carry issues. That interest is irrelevant to this proceeding. The point is he should not be rewarded for declining to work in his chosen profession by awarding him back pay.

## UNION'S POSITION

### The Company Failed to Prove it Had Just Cause to Terminate

In cases such as this, where an employee has been discharged for alleged threats that involve stigmatizing behavior or criminal conduct, arbitrators frequently apply a higher burden of proof ("clear and convincing evidence" or even "beyond a reasonable doubt").

Whether a statement constitutes a "threat" depends on the context, the way the words are used and the surrounding circumstances. Doubts should be resolved in favor of the employee.

It is clear that if the Grievant did not make the "poking buttons" comment attributed to him, he did not threaten Jones. The balance of the evidence is to the effect that the Grievant made loud, profane complaints to a Supervisor in the presence of other employees, to express his frustration about a workplace issue involving the new callout system. His use of profanity did not warrant discharge. Profanity is common in the workplace. Moreover, the Company did not discharge him for his use of profanity or the tone of his voice.

The Grievant's statement, "I'm so mad I could choke you," was a poor choice of words, made to express his frustration. However, viewed in context, it did not constitute a threat to choke Jones or cause him physical harm.

Thus, unless the Arbitrator finds, against the weight of the evidence, that the Grievant made the "poking buttons" comment, it is clear that he did not "threaten" Jones. Only Jones claims to have heard him make that statement. None of the others present in the vicinity did. However,

even if the Arbitrator finds that the Grievant made the statement, the Company cannot use it to justify the Grievant's discharge.

The statement attributed to the Grievant was to the effect, "Before you come in poking buttons like you did, you need to do your research or it is going to get ugly, and you know what that means." Those words are too vague and ambiguous to constitute a threat. Jones himself admitted that he "had no clue' what the Grievant meant by the comment because it was so "open-ended." He did not ask the Grievant what he meant.

The meaning of such ambiguous words can be gleaned from extrinsic and contextual factors. The Grievant was frustrated about a workplace issue involving the new callout system. If made the statement was meant to express that frustration. He made no reference to a gun. Nor did he make any violent gestures or overt physical actions; nor did he attempt to make physical contact. He remained just inside the doorway and never approached Jones in a confrontational manner.

Jones and the Grievant had a long history, which included working together on the same crew. The Grievant had never threatened or intimidated Jones in the past and there is no history of physical or verbal altercations between them. In fact they had attended concealed carry classes together and had some social contact outside of work. Rather than resolving the vague and ambiguous comment in favor of the Grievant, the Company jumped to the worst possible conclusion—that a physical threat had been made. It did so in spite of the fact that its investigation revealed that the Grievant had no history of violent or threatening behavior in his 18 years of employment.

Response time is a critical factor when evaluating the reality and severity of an alleged threat. The evidence is clear that Jones did not view the Grievant's words as a threat until after his conversation with Swanson wherein Swanson told him that the Grievant carried a gun at work. Prior to that point in time, Jones had a conversation with Union Business Representative Wedell wherein he stated that he had just had "a little incident" that was "under control" and that it was just "Brian being Brian." Jones had nothing to gain by downplaying the severity of the incident in that conversation.

When Swanson went to Jones and told him that the Grievant had guns, Jones confirmed that he was aware of that fact because they had taken a concealed carry class together. It was common knowledge that the Grievant possessed guns and that a "gun culture" existed at the Galesburg Operating Center. Most bargaining unit members owned guns and hunted. Jones even said that the Grievant probably had a gun in his vehicle on Company property as they spoke. It was not until Swanson toldJones that the Grievant carried a gun in an ankle holster at work that he perceived the Grievant's words to constitute a serious physical threat. He responded "Oh my god, this is a game-changer."

This conclusion is confirmed by Jones' actions following this conversation. He contacted Brackney a second time and relayed the unverified claim that the Grievant was "carrying at work," and expressed concern for the safety of himself and others in the office.

In effect, Swanson's unsubstantiated allegation, that the Grievant was carrying at work, converted the situation from being "a little incident" involving "Brian being Brian" that was "under control," into a serious physical threat. Jones cannot be faulted for being concerned after talking to Swanson. Ideally, he should have insisted that Swanson identify his sources. It turns out that Swanson's claim was based on hearsay statements attributed to employees he has refused to identify. He admitted that his concerns were based on rumors and that he never really worked with the Grievant or saw him with a gun at work or in his car.

The Company contends that it can take into account the fact that the Grievant owns guns in determining whether a serious physical threat was made. That argument fails in a gun culture such as the one that exists at the Galesburg Operations Center. Accepting that argument would mean that the Company could always assume the worst when interpreting a vague and ambiguous comment made by any of the bargaining unit members in Galesburg.

The Company also jumped to the worst possible conclusion as to the Grievant's intent. Under the just cause standard, the Company was obligated to verify Swanson's claim. The Company did try to do that. It interviewed 18 employees who had worked with the Grievant. VanUnnik had served as the Crew Leader for the Grievant for more than 11 years. Others had spent substantial periods of time working alongside the Grievant. None of them had ever seen the Grievant carrying a gun at work. Only Brad Wheeler even mentioned the possibility—based on a statement allegedly made by another employee at an unknown place and time.

Even the decision maker, Daetta Jones, admitted that there was no evidence that the Grievant had ever carried a gun on Company property. On the contrary, the evidence supports a finding that he had never done so. None of the 11 employees had ever observed it. It is clear that Daetta Jones must have accepted the rumors as true, even in the absence of evidence, based on her concern that it might be true.

Standing in opposition to these unsubstantiated rumors is the evidence concerning the extensive background tests and training the Grievant received in the Navy and in order to get a concealed carry permit. He had no history of mental illness, or the commission of felonies or violent acts. The Company and decision maker were aware of the fact that he had obtained and maintained a concealed carry permit, but apparently gave that no weight in the investigation.

In the process of terminating the Grievant, the Company gave unlawful consideration to the fact that the Grievant stored a firearm in his personal vehicle while it was parked on Company property. The Illinois Concealed Carry Act provides, in 430 ILCS 66/65 (b), that a license holder "shall be permitted to carry a concealed firearm on or about his...person within a vehicle into the parking area and may store a firearm or ammunition concealed in a case within a locked vehicle or locked container out of plain view within the vehicle in the parking area." A "case" is broadly defined to include such areas as a "glove compartment or console the completely encloses the concealed firearm or ammunition...."

There is no dispute that the Grievant held a concealed carry license and stored a firearm on the Company's parking lot in a case within a locked vehicle out of plain view. Therefore he was

within his statutory rights.  Under the plan language of the Act, the Company cannot enforce the provision in its WVP to deprive him of that statutory right.

There are no cases in Illinois that address this issue.  If the Arbitrator concludes that it is not possible to resolve this issue based on the statutory language alone, it should be resolved in the Union's favor in light of the legislature's stated intent when the proposed law (HB 0183) was being debated.  During that debate, shortly before it was passed on May 31, 2013, one of the Senate sponsors (Senator Forby) offered the following explanation of the parking lot exception found in 430 ILCS 66/65 (b):

> "And the other thing that we thought was really, really big on this bill was a safe haven.  People all over the State travels (sic) from one end of the State to the other State, and if you're down south, where I live, if I'm going to Minnesota or something, I travel through Chicago or any place else in the State of Illinois, I need to know where I'm legal and I'm not legal.  So we tried to make it a uniform deal so you can go from one—one place to another.  So your car is what we call a safe havens (sic)—haven place, and that is, as long as you got your gun traveling through the State in your car, that you will be fine with that.  And another thing it is, if—for example, if you are running into town, you got to go to the post office or something like that, and you have a gun on you, you can pull into the post office parking lot, lock the gun up in your car and you can go into the post office and get your mail.  Or if you have and emergency at a hospital, it'll work the same way.  We…just needed something where people will be able to—driving down the road if something happened."

The Company argues that, notwithstanding this provision of the Act, it can restrict an employee's right to store a gun on its parking lot.  Accepting that argument, would undermine the stated purpose of the Act, i.e., to provide a "safe haven" to licensees so they can store their firearms in their vehicles on parking lots.  It would also frustrate the intent to provide "uniformity," so licensees know when they can store a firearm inside their personal vehicle.

There are other sources offering interpretations of the Act that make it clear that it takes away the Company's right to prohibit an employee holding a concealed carry license from storing firearms in a persona vehicle on its parking lot.

Shortly after the Act went into effect, the Illinois State Bar Association Section on Labor and Employment published an article by Richard A. Russo in its Newsletter.  As stated in that article:

> "…there is a parking lot exception to an employer's ability to prohibit firearms on its property, applicable to all employers, including those included on the list of prohibited areas.  The Act restricts an employer from prohibiting concealed carry license holders from being able to carry their concealed firearm on their person within a vehicle onto the employer's parking lot and being able to store the firearm in the vehicle while parked in the employer's parking lot."

The Illinois Council Against Handgun Violence—a not for profit organization dedicated to the reduction of death and injury caused by firearm violence—has also taken the position that employers cannot prohibit licensed employees from storing firearms in locked vehicles on a company parking lot. After the law was enacted, the Council published "The Illinois Citizens Concealed Carry Law Handbook," in order to provide helpful information about the Act to citizens and business owners. The following appears in a Q and A section drafted for business owners:

> "Do I have to allow employees that are concealed carry license holders to carry loaded, concealed guns at work?

> "The law only requires employers to allow guns if they are hidden in locked vehicles. Employers may prohibit guns in other areas so long as the owner of the property agrees and the sign is posted."

This quote also serves to point out that the Company's attempt to prohibit the Grievant from storing his firearm in his locked vehicle on its parking lot also violated another provision of the Act. In order to prohibit the possession of firearms on private property (other than a private residence) under 430 ILCS 66/65 (a-10) of the Act, owners are required to post a sign, described in 430 ILCS 66/65 (d) of the Act, that clearly and conspicuously indicates that guns are prohibited on the property. The Grievant testified without dispute that the Company did not post any sign on the parking lot.

### The Company Should Have Followed Progressive Discipline

The Grievant's conduct toward Jones was unprofessional and disrespectful. However, in light of his work record, the circumstances surrounding the offense, and the fact that the Grievant took responsibility for this single, isolated act of misconduct, the Company should have followed progressive discipline.

The Grievant had a near perfect record of employment prior to his discharge. His only prior discipline was a written reprimand he received in 2006 for a vehicle accident. That reprimand expressly recognized his years of service and good performance. In the 10 years that followed, he received no counseling or discipline and he successfully bid into a position as a Crew Leader.

At the hearing, the Grievant acknowledged that he used a poor choice of words, including profanity, to vent his frustration over a workplace issue—the implementation of the new callout system. He expressed remorse about his conduct toward Jones. He had never done anything like that in his previous 18 years of employment, and he testified that he would never do so again.

None of the employees the Company interviewed, including all who testified at the hearing, had ever observed the Grievant lose his temper, use intimidation, cuss anyone out, or treat anyone in the manner he treated Jones on June 3, 2016. There is no record of his having done so and there is no evidence to suggest that he might do so again. Even Jones agreed. He testified that he had worked with the Grievant in the field for five or six years and he had "never seen him like this

before." The Grievant deserves an opportunity to demonstrate that this event was an aberration, and the principles of just cause require it.

## After Acquired Evidence

At the hearing the Employer offered evidence about alleged performance and misconduct issues that are irrelevant to the issues before the Arbitrator. That evidence should be disregarded.

The Company asserts that it terminated the Grievant solely because he allegedly violated the WVP. Despite that assertion, the Company spent the bulk of its case, parading out bargaining unit employees to elicit testimony concerning matters that the Company's attorney admitted it did not rely upon in deciding to terminate the Grievant. It also solicited such testimony from Jones, who had worked with the Grievant when he was in the bargaining unit.

The Company attacked the Grievant's safety practices, attitude and work ethic, and communication skills. The Grievant was never confronted regarding any of these alleged performance and misconduct allegations—many of which occurred well into the past. It is an accepted principle that a decision to discharge an employee must stand or fall on the reason given at the time. An employer cannot add other reasons for the discharge in arbitration. Elkouri and Elkouri, *How Arbitration Works*, (8th Ed. 2016), p. 15-62.

There is a limited exception to this general rule, for pre-termination conduct identical to that for which the Grievant was discharged. *Id*. At p. 15-63. Here the after-acquired evidence had nothing to do with threats, temper, intimidating or aggressive behavior, possession of a gun on Company property, or any other conduct that would arguably violate the provisions of the WVP.

Some of the testimony of other bargaining unit employees subpoenaed by the Company is relevant. Their testimony helped to establish that he had no history of making threats, losing his temper, carrying a gun at work, or doing anything remotely resembling the underlying offenses that led to his termination.

## Conclusion & Remedy Requested

The Arbitrator should sustain the grievance in its entirety and order the Company to reinstate the Grievant and make him whole for all lost pay and benefits. In addition, the Union asks the Arbitrator to retain jurisdiction in this case for 60 days, solely for purposes of resolving any disputes that may arise concerning the remedy.

## DISCUSSION

It is necessary to resolve certain questions of fact, before addressing the parties' arguments on the merits. The first question has to do with what exactly the Grievant said that constituted a threat according to the Company.

**What The Grievant Said**

There is no doubt that the Grievant spoke in a loud, angry voice and used profanity on multiple occasions.  In particular, many of his statements included variations on the "F-word."

In the letter of termination, it is alleged that the Grievant said, "I am fucking pissed," and "I am so mad I could choke you."  The record is essentially undisputed that he made those statements, or words to the same effect.  That he did so is confirmed by the testimony of Jones and his nearly contemporaneous notes, and the testimony of both Stillson and Peterson.  Significantly, the Grievant does not deny that he did so.

While Graves, whose office was closest to the events, did not recall hearing the statement in question, he states that he "tuned them out" and did not recall any specific statements.  All he could recall is that the Grievant's outburst had something to do with a callout or Supervisor Norman, and the Grievant was talking loudly, using the "F-word;" "was pretty wound up;" and "pretty angry sounding."

It is true, Sammelman testified to the effect that the Grievant just asked questions for clarification, spoke in a normal voice most of the time, and made no statements of the type alleged.  However on its face, and for the reasons identified by the Employer in its arguments, his testimony is not deemed useful.

The more difficult factual question is whether the Grievant also said. "If you come in poking buttons like you did, it is going to get ugly and you know what that means," just before he "stormed out" of the office area.  The Grievant denied that he said words to that effect and none of the three witnesses (Stillson, Peterson and Graves) was able to say if those words were spoken.[3] For a number of reasons, some of which will be discussed below, the Arbitrator finds that the Grievant did say words to that effect.

First an foremost, Jones reduced his recollection of what was said to writing immediately after the incident.  The statement Jones attributed to the Grievant was made after the Grievant entered the office and began speaking more quietly.  It has a unique content to it and there is no evidence to support a finding that Jones would fabricate such a claim.

Jones' handwritten notes on this aspect of the confrontation read in context as follows:

"As I was writing these notes Brian Knox came back up to my office

---

[3] It is significant that, according to Jones' notes, this statement was made after the Grievant lowered his voice.

"Present: Gabe Jones  Brian Knox  Matt Sammelman

"Brian started the conversation by stating he was fucking pissed, this isn't right he then stated "I'm so mad that I could choke you" I said to Brian that he needed to calm down  he then said this is bullshit, I interrupted him and said that he needed to close the door and he replied that he didn't give a damn who heard the conversation  I said Brian out of respect for everybody else in this office we are not going to do this and if he wanted to continue this conversation he was going to have to calm down or else close the door.  He calmed down.  Lowered his voice and then proceeded to say that Vic should of put him on duty as he was the one who called him in the first place  He asked if (sic) why nobody put them on, I stated that it wasn't our responsibility  he said that Norman or Vic should have put him on  I said with Norman's lack of knowledge he wouldn't know how long a job would take.  I said that I wasn't aware of any change as far as us (Management) putting them on when they are going to be working late.  He said that I needed to do my research before I come in 'coaching' as this was the way it had always been.  I said that I wasn't aware of that.  He said if I come in poking buttons like I did it was going to get ugly and I knew what that means  (He was visibly shaking)  He said he was so sick of this shit  Vic's a fucking idiot and that he is sick of that stupid fucker, fucking everything up and him having to fix it.  He said that he now knows that nobody has his back and that it's duly noted and he will take care of it going forward."

All the credible evidence indicates—and the Grievant himself admits—he was very upset, so much so that he was yelling an using obscenities and couldn't recall much of what was said.  All of the witnesses who had worked with the Grievant during his 18 years of employment, some of whom admitted that they did not like working with him, essentially agreed that his conduct on June 3 was out of character.

Earlier, as the Grievant left the counseling session, he said, in reference to the new callout procedure, words to the effect, "That's fine don't ever fucking call us again."  If the ambiguous statement that things were "going to get ugly" if Jones persisted in "pushing buttons," is read in light of that earlier statement, it is quite believable that he said it.  That observation leads into the next question as to whether and to what extent either statement cited in the letter of termination constituted "*threatening another individual or threatening, talking or joking about engaging in behaviors that harass, intimidate or inflict harm upon another individual*."

**The Alleged Threats**

The Grievant's statement to Jones, "I'm so mad I could choke you" needs to be viewed in light of the words used and the circumstances surrounding the statement.

First, it should be noted the statement was conditional. The Grievant said, "I could choke you." He did not say, "I'm going to choke you." Such a conditional statement easily could have been intended as a hyperbolic figure of speech, albeit an aggressive and offensive one.

It is true, if delivered under the right circumstances, such a statement could constitute a threat to engage in an assault. If the Grievant had been engaged in a physical confrontation, standing face-to-face with Jones or standing over Jones, and said those words in a menacing way the use of the conditional word "could" fades in significance. However, it is undisputed that the Grievant was standing in the doorway to Jones' office when he made this statement. There was no physical confrontation. The Grievant was expressing his anger over having been "disciplined unfairly" (he thought) by Jones, who was not his regular supervisor, for failing to follow a new procedure with which he disagreed.

The conclusion that the evidence will not support a finding that the Grievant actually threatened Jones with physical harm obviously does not excuse his behavior. The statement and his overall conduct was way out of line and clearly deserving of some discipline.

As indicated above, the Arbitrator finds that the Grievant said words to the effect that things are "going to get ugly" if Jones continued to "poke buttons." In light of his disagreement with the new procedure and his earlier comment about resisting callouts, it is quite believable that he said those words, predicting a lack of cooperation and troubled labor-management relations. However, the evidence does not meet the standard of proof necessary to support a finding that he intended convey a threat to resort to violence. That idea arose out of Jones' subsequent conversation with Swanson.

It is fortuitous that Union Business Representative Wedell happened to call Jones shortly after the second incident and before Swanson spoke to him. The content of that conversation leaves no room for doubt that Jones was prepared to treat his two encounters with the Grievant for what they were—loud, disrespectful and inappropriate.

When asked how his day was going, Jones told Wedell that he had been involved in a "little incident" with the Grievant and that it was "under control." If Jones believed that he had just been threatened with serious physical harm—and was not ready to share that information with Wedell until after he had spoken to his superiors and a course of action had been established—he probably would have said nothing. If he decided to mention it at all, he probably would have said something to the effect that the matter was under investigation and he

- 39 -

was not ready to discuss it.  Instead, he admits, he "literally blew it off," and chalked it up to "Brian being Brian."

The only evidence that might support a different conclusion is found in the testimony of Graves.  Graves testified that when he entered Jones' office immediately after the incident and tried to make a joke, Jones appeared "shell-shocked" and he left.  However, according to Graves, Jones had just been subjected to two loud outbursts of obscene and abusive language and was trying to make accurate notes of what had just happened.  Also, there is reason to question the timing of Graves" visit to Jones' office.[4]  It might well have been later, after Swanson had spoken to Jones.

It is understandable that Jones became alarmed and feared for his safety after his conversation with Swanson.  Swanson apparently believed the rumors he had heard to the effect that the Grievant carried a gun to work and kept it on his person, in an ankle holster.  Swanson's frame of mind can best be summed up in his statement that, "after thinking about it," he concluded, "I don't think I could live with myself in the event an incident did happen." Swanson was not a gadfly; he had worked as a Lineman in Galesburg for 18 years and he held a number of responsible positions in the Union.

However sincere Jones and other Company officials may have been in their belief that the Grievant's statements should be taken as a threat to resort to physical violence, presumably involving the use of a gun, the record does not support that belief.  Like most bargaining unit employees in the Galesburg facility, the Grievant owned guns and used them for hunting and target practice.  He collected guns and, like some others, he had obtained a concealed carry license.

None of the Grievant's coworkers claimed to have ever seen him carry a gun on the job. The Grievant made no reference, overt or covert, to the use of a gun.  His only reference to the use of physical force is found in his statement, "I'm so mad, I could choke you."  Even though that statement did not make reverence to a gun, if it had been made as an actual threat rather than as a figure of speech, this would be a much different case.

Based on the record presented, the Arbitrator is satisfied that the Company has shown that the Grievant made statements to Jones that were offensive and a "clear affront to [his]

---

4 According to Jones, he left his office immediately after the Grievant's abusive conduct and told Graves "everything's cool" and asked Graves if he had heard "any of that." He then left to answer the call from Wedell.

authority," but that it has not met its burden of proving that the Grievant made statements that were "threatening, intimidating and aggressive," so as to constitute a violation of the WVP

**The Gun in the Grievant's Truck**

Again, there are questions of fact that ought to be resolved before addressing the parties' arguments on the merits. First, there is the question of whether the Grievant knew the gun was in his truck. On the day the gun was found in his truck, the Grievant alleged that he asked his son to remove all of the guns from his truck, after a day of target practice, and that he thought he had done so. He repeated that claim at the hearing. His son did not testify.

The Grievant's claim that he did not know that the gun was present is supported by his denial at the time that he had any guns in his truck and his willingness to allow the search. However, it is clear that the Company did not believe him, because it viewed that denial as inconsistent with his claim that he had a right to have the gun in his truck at work. The Company continues to take that position in its written arguments. It also argues that his claim is inconsistent with his general practice of transporting guns in his truck, as described in his own testimony and that of others.

There is no inconsistency between the Grievant's claim that he asked his son to remove all guns from the truck and did not actually know the gun was in his truck on the day in question, and his claim that he had a statutory right to keep the gun in his truck while it was parked on the Company parking lot. Under these circumstances, the Arbitrator finds that the evidence falls short of establishing that the Grievant "knowingly" possessed the gun in his truck on the day in question. However, at a minimum, he was guilty of a careless disregard for the requirements of the rule.

The Company rule prohibits the possession of weapons such as handguns, while on Company property, "including in vehicles located on Company parking lots," unless such possession has been "authorized" by the Company. Unlike the statute (at 430 ILCS 66/65 (a)) the rule does not specify whether the weapon must be "knowingly" possessed for there to be a violation of the rule.

The Grievant did possess a handgun in his truck while it was parked on Company property. Thus, he did violate the letter of the rule. The fact that he may not have known that it was present on that particular date is a fact that should be taken into account (along with his careless disregard for the rule) in evaluating the seriousness of the violation.

- 41 -

The parties also disagree as to whether the gun was "loaded." While that is a fact of relatively minor importance for purposes of this proceeding, a review of the evidence establishes that the gun apparently was not "loaded" in the usual sense of that word, Norman testified that he examined the "magazine" (clip) and determined that there were rounds of ammunition in it. According to the letter of termination, the clip was attached to the holster, not inserted in the gun. Norman did not take the gun out of the holster. Thus, he could not know if there was a bullet in the chamber. According to the Grievant, there was no bullet in the chamber. That is a safety practice, consistent with the practice of keeping the loaded clip separate from the gun.

## The Relevance of the Concealed Carry Act

This case raises a fundamental question about when, if ever, an arbitrator ought to consider whether outside law overrides a provision in a collective bargaining agreement, or in this case, an established rule adopted by an employer and enforced through discipline under the just case standard in the Agreement.

The Union contends that the Arbitrator should consider the impact of outside law in this case. The Union argues that Illinois law is "clear" and that, under the "plain language" of the Concealed Carry Act (CCA), the Company gave "unlawful consideration" to the fact that the Grievant exercised his statutory right to keep a firearm in his personal vehicle while it was parked on Company property.

The Employer argues that the Arbitrator ought not attempt to interpret or apply state law to the facts in this case. In its view, the Arbitrator's authority is limited to the proper interpretation and application of the collective bargaining agreement.[5] Consequently, it argues, he should limit his consideration to the application of the terms of the Company's WVP, and not attempt to decide the impact of external law on the vitality of that policy. The Company also notes that, as of the date of the arguments in this case, there were no court cases interpreting and applying the relevant provisions of the CCA.

There is a longstanding debate among arbitrators over the question of when, if ever, it is appropriate to consider "outside law" in connection with the interpretation and application of

---

5 Article II, Section 1 provides that the grievance procedure is available to settle "any differences" that arise between the Company and Union. Article III, Section 2 of the Agreement provides, "In considering any dispute under this provision the Arbitrator shall have no authority to amend, delete from or add to this agreement."

the terms of a collective bargaining agreement that does not purport to incorporate outside law. This Arbitrator attempted to outline the parameters of that debate, sometimes described as the "Howlett-Meltzer debate," in the *Journal of Law and Education*, Volume 18, Number 4 (Fall 1989) at pp. 505-513. In that article, it was noted (at p. 506) that one of the possible uses of outside law was as follows:

> "An arbitrator, who has been asked to honor or enforce a provision of a collective bargaining agreement might refuse to do so, based upon the belief that the provision is illegal or would produce an illegal result under outside law."

In the search for an appropriate "middle ground" between the divergent views expressed by Robert Howlett and Bernard Meltzer, Arbitrator Richard Mittenthal proposed a partial modification in Meltzer's conservative axiom ("apply the contract and ignore the law"). Mittenthal suggested that when there is a conflict between the law and the agreement, the arbitrator should "permit conduct forbidden by law but sanctioned by contract," but should not "require conduct forbidden by law but sanctioned by contract." (Id. At p. 508.)

One of the central purposes of labor arbitration is to provide the parties with a decision that is final and binding. As stated in the cited article, it is not likely that an effort will be made to vacate an award where an arbitrator "elects to ignore a contract provision or refuses to enforce it based upon the conclusion that it is illegal or would produce an illegal result," *if the arbitrator is correct in that regard*.[6] As the Arbitrator went on to observe:

> "…a legitimate question still arises as to how well are parties served by an arbitration award [that] consciously gives effect to, or requires compliance with, an illegal provision. Such an award invites non-compliance or a challenge to its validity. For practical reasons, going beyond considerations of the validity of the award, an arbitrator faced with such a dilemma might be tempted to follow the suggestions of Mittenthal and Sovern, among others [footnote omitted]. No arbitrator relishes the prospect of issuing an award that is a nullity or subject to being vacated by the courts. Also, arbitration is intended to be an inexpensive, expedient way to resolve disputes with finality, not a prelude to litigation."

The dilemma presented in this case is somewhat simpler than the classic dilemma assumed by the above discussion. The Union is not asking the Arbitrator to ignore a provision of the Agreement, which would arguably violate the contractual limits on his authority. Further, it is not asking the Arbitrator to nullify the Company rule prohibiting "any employee, customer,

---

[6] But, it is fair to ask, "How often is the law so clear?" (Id, at p. 513.)

vendor, contractor, or visitor" from possessing a weapon in a vehicle while parked on Company property. It is asking the Arbitrator to conclude that the rule is illegal and unenforceable, as applied to an employee, holding a concealed carry license.

Based on this analysis, the Arbitrator concludes that it is appropriate to consider the merits of the argument advanced by the Union.

## The Rule is illegal and Unenforceable as Applied to Grievant

The Arbitrator must agree with the Union. The law is clear. On its face, it serves to prohibit the Employer from enforcing its rule in the Grievant's case, because he is in possession of a concealed carry license. It reads, in relevant part, as follows:

"(a-10)      The owner of private real property of any type may prohibit the carrying of concealed firearms on the property under his or her control. The owner must post a sign in accordance with subsection (d) of this Section indicating that that firearms are prohibited on the property, unless the property is a private residence. [Emphasis added.]

"(b)    Notwithstanding subsections (a), (a-5) and (a-10) of this Section except under paragraph (22) or (23) of subsection (a), any licensee prohibited from carrying a concealed firearm into the parking area of a prohibited location specified in subsection (a), (a-5), or (a-10) of this Section shall be permitted to carry a firearm or ammunition concealed in a case within a locked vehicle or locked container out of plain view within the vehicle in the parking area...." [Emphasis added.]

The Company concedes that the provisions of 430 ILCS 66/65 (b) do allow the holders of an Illinois concealed carry license to bring a gun onto the parking lot of a company that otherwise prohibits them from bringing guns onto its property. However, it argues, that provision deals with the rights of license holders under the concealed carry law, not the employment policies of such company. In its view, the provision means that permit holders are not in violation of the concealed carry law (or acting outside the purview of their license) by bringing a gun onto the parking lot of a company that prohibits concealed carry, provided the gun is left in a locked vehicle and secured in a "case" out of view. The fact that such an individual does not violate the law does not mean that he or she has complied with an employer's rule prohibiting the presence of a weapon on company property.

The problem with this argument is twofold. First of all it effectively carves out an exception for employees, even though the statute contains no exceptions to its broad assertion

- 44 -

that concealed carry license holders "shall be permitted to carry a firearm or ammunition concealed in a case within a locked vehicle or locked container out of plain view within the vehicle in the parking area" of the designated properties. Read together, subsections (a-10) and (b) place limits on the rights of owners of real property (other than private residences) and create rights on behalf of persons who possess concealed carry licenses.

The Employer has cited no language in the CCA or in its legislative history suggesting that any limitations were intended other than those specifically stated. Under Section 65, the Illinois Legislature has seen fit to allow holders of concealed carry licenses to keep weapons in their vehicles when parking on property belonging to schools, preschools, courts, local government, juvenile detention and correctional institutions, prisons, jails, hospitals, mental health facilities, nursing homes, bars, playgrounds, parks, and numerous other places. The only exceptions are nuclear facilities and areas where firearms are prohibited under federal law. If there was an intent to allow exceptions for employees who work in any of those various places or on private real property, it is reasonable to assume the law would so state.

Second, an owner of real property (other than a private residence) who wishes to prohibit the carrying of concealed firearms on property under his or her control, must post signs that meet the requirements of subsection (d). The Grievant's testimony that the Company has not done so stands unrefuted in the record. Thus, even if Section 65 could be interpreted to make an exception in the case of employees, the Employer's attempt to enforce its rule would have to be found unlawful under the CCA for failure to meet that requirement.

**Summary and Conclusion**

The evidence establishes that the Grievant spoke to Jones in a loud, angry voice and used profanity on multiple occasions. His statements included frequent use of the "F-word." He was disrespectful and abusive toward a Supervisor and did so within the hearing distance of several office employees. While those office employees may have heard Linemen use profanity in the past, his use of such language was part of an angry outburst that was disruptive an offensive.

While the Grievant did make the two statements attributed to him, neither statement constituted a threat of physical harm or the possible use of a weapon. Further, the record establishes that the Grievant's behavior on June 3, 2016 was unusual and out of character. He had never before engaged in such conduct during his 18 years of employment. His record was essentially free of discipline, except for a written reprimand he received for an accident that

occurred approximately 10 years earlier. He recognizes that his behavior was inappropriate and vows not to repeat such conduct in the future.

The Grievant's termination was based in large part on the Employer's conclusion that he had threatened Jones with physical harm and might use a lethal weapon to carry out that threat and that he violated the WVP by leaving a gun in his vehicle while parked on the Company's parking lot. For the above reasons, the Arbitrator has found that the Grievant did not threaten Jones as alleged and that, under Illinois law, the Employer cannot discipline him for leaving a gun in his car while in its parking lot. Under these circumstances, it is appropriate for the Arbitrator to overturn his termination and reduce the discipline to a level of progressive discipline more commensurate with these findings.

In the view of the Arbitrator, the Grievant's conduct was sufficiently serious to justify a suspension of 30 days, combined with a warning that repeated conduct of a similar nature will result in his immediate discharge.

The Employer presented "after acquired" evidence, which if accurate strongly suggests that over the years the Grievant has exhibited poor work habits and engaged in unsafe practices that went undetected and unaddressed. Based on that evidence, it asks that he not be reinstated and that he not be awarded any back pay.

That request is denied. It would be unfair and unreasonable to deny reinstatement or back pay to an employee who has been wrongfully terminated, for conduct of the type alleged that went undetected and unpunished. If the Grievant accepts an offer of reinstatement, the Employer will have an opportunity to observe his behavior and, if he engages in behavior of the type alleged, take timely and appropriate remedial or corrective action.

For these reasons, the undersigned concludes that the grievance should be sustained and issues the following:

## AWARD

1.  The termination of Brian Knox, on or about June 27, 2016, was not for just cause. The Employer should have followed progressive discipline and suspended him for 30 days with a warning that repeated conduct of the same character will result in his immediate discharge.

2.  To remedy the violation found, the Employer is directed to immediately offer to reinstate Brian Knox to his employment with no loss of seniority. Unless the parties agree to a different time limit, Brian Knox shall have a period of two weeks after receipt of such offer, in writing, in which to inform the Employer as to whether he will accept the offer.

In addition, the Employer shall make him whole for the wages and benefits he has lost as a result of his termination.  In making him whole, the Company shall follow the same practices and employ the same offsets that it normally applies in such cases.  The Employer shall have the right to withhold the equivalent value of 30 days' pay and benefits from the final calculation.

3.  The Employer shall withdraw the letter of termination given to Brian Knox on June 27, 2016 and substitute a letter notifying him that his termination has been reduced to a 30-day suspension and warning for the reasons stated in this award.

4.  The undersigned retains jurisdiction in this case for the sole purpose of resolving any dispute over the intent of the remedies ordered, or their implementation.  The Union shall send the undersigned a notice of the status of this case, with a copy to the Company, within 60 days of its receipt of this decision.

 

_____

George R. Fleischli, Arbitrator     Date